# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISANA

| | | |
|---|---|---|
| QUANEECHA JOHNSON on behalf of T.P.; | * | CIVIL DOCKET |
| WAYNEKKA RANDLE on behalf of N.P.; | * | |
| JASMENE RUFFIN on behalf of E.P.; | * | |
| | * | NUMBER: 19-13949 |
| VERSUS | * | |
| | * | |
| MARLIN N. GUSMAN, | * | SECTION |
| ORLEANS PARISH SHERIFF; | * | |
| WELLPATH, LLC; | * | |
| GARY MAYNARD, | * | JUDGE |
| OPSO COMPLIANCE DIRECTOR; | * | |
| OPSO DEPS. JOHN/JANE DOES 1-5; | * | |
| MEDICAL STAFF MEMBERS | * | MAGISTRATE |
| JOHN/JANE DOES 6-10 | * | |
| | * | |

*******************************************

## COMPLAINT

1.   This action is filed as a result of the death of Edward Patterson, the father of the Plaintiffs' children, and cherished member of his family, who died of a drug overdose while in the custody of defendant Marlin Gusman at the Orleans Justice Center. Although at the time of his passing Mr. Patterson had not yet been afforded a trial of his charges, both he and his family expected that the Defendants would keep him safe while he was in custody.  Instead, defendants failed to adequately staff the facility to ensure his safety, and failed to prevent illegal drugs from entering the facility where Edward was housed.  These conditions echo the complaints of many other families who have lost loved ones while incarcerated at the facility in recent years, and undoubtedly sustains the ongoing pattern of unconstitutional standards and practices at the Orleans Jail.  Though the defendants were undeniably aware of the alleged conditions, their

negligence permitted such conditions to reoccur and even proliferate, and Edward died as a result.

## <u>JURISDICTION</u>

2.  This action is brought pursuant to 42 U.S.C. §§ 1983, pursuant to the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1988. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1332, and 1343, and the aforementioned statutory and constitutional provisions. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. §1367.

## <u>PARTIES</u>

### (Plaintiffs)

3.  **QUANEECHA JOHNSON, on behalf of her minor child, T. P.** a minor citizen of the United States and is domiciled in New Orleans Louisiana, and who is the daughter of the Decedent, Edward Patterson.

4.  **WYNEKKA RANDLE, on behalf of her minor child, N. P.** a minor citizen of the United States and is domiciled in Houston, Texas, and who is the daughter of the Decedent, Edward Patterson.

5.  **JASMENE RUFFIN, on behalf of her minor child, E. P.** a minor citizen of the United States and is domiciled in New Orleans Louisiana, and who is the son of the Decedent, Edward Patterson.

**(Defendants)**

6.   **MARLIN N. GUSMAN**, in his individual and official capacity as Sheriff of Orleans Parish, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. At all times described herein, he was the Sheriff of Orleans Parish and, as such, was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command, as well as medical personnel. He was responsible for all actions of OPSO staff. He was also responsible for the supervision, administration, policies, practices, customs, and operations of the Orleans Parish Sheriff's Office and its correctional facilities. He was and is a final policy maker.  He is liable both directly and vicariously for the actions alleged herein.

7.   **GARY MAYNARD**, in his individual and official capacity as Compliance Director of the Orleans Parish Sheriff's Office, is an adult citizen of the United States and, on information and belief, is domiciled in the Eastern District of Louisiana. At all times described herein, he was the Compliance Director of the Orleans Parish jail, aka the Orleans Justice Center ("OJC"). As such, he was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command, as well as medical personnel. He was responsible for all actions of OPSO staff. He was also responsible for the supervision, administration, policies, practices, customs, and operations of the OJC and its personnel at OJC. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

8.   **WELLPATH, LLC**, formerly known as CORRECT CARE SOLUTIONS, LLC, was at all relevant times the entity with which the Orleans Parish Sheriff's Office contracted to provide medical and mental health services to prisoners at the Orleans Parish Jail.

**WELLPATH** was responsible for provision of all staffing, training, policies and procedures for all medical and mental health personnel at OJC.

9.    **OPSO DEPS. JOHN/JANE DOES 1-5,** in their individual and official capacities as Orleans Parish Sheriff's Deputies, are adult citizens of the State of Louisiana and, on information and belief, are domiciled in the Eastern District of Louisiana. At all pertinent times, defendants **JANE/JOHN DOES 1-5** were employed by OPSO as correctional officers assigned to the OJC. On information and belief, defendants **JOHN/JANE DOES 1-5** failed to monitor the area where Edward Patterson was housed, thereby permitting Edward ingestion of drugs leading to his death**.**

10.    **MEDICAL STAFF MEMBERS JOHN/JANE DOES 6-10**, in their individual and official capacities as employees of **WELLPATH**, are adult citizens of the State of Louisiana and, on information and belief, are domiciled in the Eastern District of Louisiana. At all pertinent times, defendants **JANE/JOHN DOES 6-10** were employed by **WELLPATH** as medical professionals assigned to the OJC.  On information and belief, defendants **JOHN/JANE DOES 6-10** failed to adequately monitor the area where Edward Patterson was housed and/or failed to treat Edward Patterson according to the applicable standard of care, thereby leading to his death.  Alternatively, **JOHN/JANE DOES 6-10** were the source of the illegal drugs ingested by Edward and which ultimately resulted in his death.

## FACTUAL ALLEGATIONS

11.  In or about January 2015, Edward Patterson was arrested and booked into OPSO custody.

12.  On or about November 26, 2018 Edward Patterson was observed smoking an

unknown substance while in the custody of OPSO at the OJC.  Eventually, after displaying abnormal behavior, Edward was transported to University Medical Center for treatment. However, by the time he arrived at the hospital he was asymptomatic and was release back into OPSO custody.

13.   Upon information and belief, following his return from University Medical Center Edward was not removed from the tier where he was initially observed ingesting the unknown substance.  Instead, he was permitted to remain in the same tier with the same inmates and same OPSO personnel.

14.   On information and belief, the tiers where Edward was housed during this period suffered from severe staffing shortages and lack of supervision.  Security staff were routinely absent from the tier for long periods of time, leaving inmates unsupervised.  This failure to supervise encouraged and implicitly condoned misconduct by inmates on the tier.

15.   On information and belief, drugs and other contraband were routinely present on the tiers where Edward was housed during this time.  Inmates' access to contraband was a long-standing problem at facilities under OPSO control.  All defendants were aware of this problem but failed to correct it.

16.   As a result of Defendants failure, Edward continued to have access to unknown illegal narcotics and substances while in OPSO custody.

17.   Upon information and belief on December 1, 2018, someone introduced illegal drugs, specifically containing fentanyl, into the tier where Edward was held.

18.   On information and belief, another inmate brought these drugs onto the tier, but it is unclear to the plaintiff how this inmate was able to do that.

19.   Alternatively, upon information and belief, one or more of the **MEDICAL STAFF**

**MEMBERS JOHN/JANE DOE 6-10** introduced the drugs onto the tier.

20.   On information and belief, one or more of deputies **JOHN and JANE DOES #1-5** were responsible for screening and searching recently arrested inmates prior to the inmates being placed or on a tier at the OJC.   On information and belief, one or more of deputies **JOHN and JANE DOES #1-5** failed to adequately screen the inmate who introduced the fentanyl onto the tier on December 1, 2018.   Alternatively, on information and belief, one or more of deputies **JOHN and JANE DOES #1-5** intentionally permitted the inmate to introduce the fentanyl onto the tier.   These actions show a deliberate indifference to the risk of harm contraband such as cocaine could cause inside the institution.

21.   On information and belief, one or more of deputies **JOHN and JANE DOES #1-5** were responsible for screening and searching the **MEDICAL STAFF MEMBERS JOHN/JANE DOES 6-10** before being granted access onto a tier at the OJC.   On information and belief, one or more of deputies **JOHN and JANE DOES #1-5** failed to adequately screen the **MEDICAL STAFF MEMBERS JOHN/JANE DOES 6-10** who introduced the fentanyl onto the tier on December 1, 2018.   Alternatively, on information and belief, one or more of deputies **JOHN and JANE DOES #1-5** intentionally permitted the **MEDICAL STAFF MEMBERS JOHN/JANE DOE 6-10** to introduce the fentanyl onto the tier.   These actions show a deliberate indifference to the risk of harm contraband such as cocaine could cause inside the institution.

22.   On information and belief, there was a video surveillance system covering the tier where Edward was being housed on December 1, 2018.

23.   On further information and belief, one or more of deputies **JOHN and JANE DOES #1-5** were assigned to monitor the video surveillance system covering Edward's tier.   These

deputies were supposed to notify security staff whenever they observed a problem on the tier, such as inmates using drugs.  On December 1, 2018, these deputies failed in their duty to monitor the video feed and alert security staff to the problem obviously unfolding on Edward's tier.  Such dereliction of duty establishes the defendants' deliberate indifference to inmates' safety.

24.   On further information and belief, Edward's tier was supposed to be staffed with one or more security deputies at all times.  On December 1, 2018, it is believed one or more of deputies **JOHN and JANE DOES #1-5** were assigned to monitor Edward's tier.  These deputies failed in their duty to monitor and control the tier on which Edward was housed and it is believed they were absent from their posts for long periods of time during the day in question, leaving the tier unsupervised.   Such dereliction of duty establishes the defendants' deliberate indifference to inmates' need for protection from harm, including self-harm.

25.   As a direct result, on December 1, 2018, only five days after initially being observed ingesting an unknown substance, OJC staff was alerted by other inmates that Edward had collapsed and was unconscious on the floor of his cell.  Rather than immediately notify emergency services, CPR and naproxen were administered to Edward for thirty minutes. After these measures proved fruitless, emergency medical services were contacted. Edward was again transported to University Medical Center, where he ultimately expired at 7:43 PM.  Edward had overdosed on fentanyl and died.

26.  The neglect and dereliction exhibited by defendants that ultimately resulted in Edwards's death is part of a larger and well-documented pattern of shortcomings and failures of OPSO and more recently **WELLPATH**, formerly known as CORRECT CARE

SOLUTIONS, LLC.

27. Numerous investigations, letters, reports and lawsuits have documented the unconstitutional conditions faced by inmates in OPSO custody, including inadequate staffing, failure to adequately monitor and supervise inmates, failure by staff to adhere to established and mandated guidelines, practices and procedures, and failure to provide adequate medical attention to inmates. This pattern of dereliction and neglect created an unconstitutional risk of harm to inmates and their safety, including Edward Patterson.

28. The defendants, knew, must have known or should have known of the conditions creating these unconstitutional risks of harm, but in fact have not taken adequate steps to remedy these deficiencies. In fact, less than twenty months prior to Edward's death another inmate in OPSO custody was permitted overdose on illegal narcotics and died at OJC.

29. At the time of the detention of Edward Patterson by OPSO, the defendants knew, must have known or should have known of serious deficiencies in the policies, practices and procedures at the jail related to medical care, particularly after ingesting illegal narcotics. Defendants were also aware of the inadequate staffing and inadequate training and supervision of medical and correctional staff with regard to medical problems and emergencies of prisoners. Despite their knowledge of these serious deficiencies, the defendants failed to make necessary changes to the standing policies, procedures, training, supervision or staffing to provide Edward and others in their custody with adequate security supervision and treatment for serious medical concerns.

30. On information and belief, defendants herein have been involved in similar incidents involving substandard supervision and treatment for prisoners with serious medical needs. These incidents likewise resulted in injury and/or death to inmates in their care.

Nonetheless, the derelict parties from OPSO and/or WELLPATH were not appropriately disciplined or held accountable. In addition, those responsible for training and supervising OPSO staff and WELLPATH staff have failed in their own responsibilities to provide adequate security and care to prisoners, and have not themselves been subject to disciplinary action or accountability for failing their supervisory and/or training responsibilities.

31.   Defendants **GUSMAN** and **WELLPATH** knew, must have known or should have known of these deficient conditions, including inadequate staffing and healthcare, as described in the previous reports and litigation. Nevertheless these conditions persisted and defendants failed to make appropriate and necessary changes in policies, procedures, staffing, training and/or facilities to protect inmates from harm, including harm from contraband, and to provide adequate care to inmates facing issues of addiction. These defendants also failed to ensure that appropriate supervision and disciplinary action was taken against staff members who permitted these conditions to persist.

32.   Defendants knew, must have known, or should have known, that the standard of care for those experiencing addiction issues could not be met by the policies, procedures, or staffing of the OPSO and WELLPATH but failed to take appropriate steps to see that Edward Patterson or other prisoners in similar situations received appropriate and adequate care in accordance with community standards of care.

33.   The defendants knew, must have known, or should have known of the obvious risk that the lack of staff at OPP created for inmates held in OPSO custody. However, the defendants failed to take steps to alleviate the risk caused by the lack of staff at OPSO facilities.

34.   Furthermore, despite their knowledge of these conditions, the defendants ratified or condoned acts or omissions by OPSO staff which caused serious harm, suffering and death to prisoners at OPP, and maintained a custom and practice whereby there was no accountability for OPP staff who mistreated prisoners or who violated policies, procedures or standards of care for prisoners. The defendants' actions and failures to act were a direct and motivating force that caused the death of Edward Patterson on December 1, 2018.

35.   Defendants **GUSMAN**, as Sheriff of Orleans Parish, and **MAYNARD**, as the Compliance Director of OPSO, are ultimately responsible for hiring, training, supervising, disciplining and/or retaining all employees at the OPSO. They are responsible for all policies  and procedures at OJC. They are responsible for each and every other defendant named herein.

36.   Defendant **WELLPATH** is ultimately responsible for hiring, training, supervising, disciplining and/or retaining the medical defendants. It is further responsible for policies, procedures, and customs of the medical personnel of the OPSO. Further, **WELLPATH** had the responsibility and duty for the diagnosis, oversight, review, monitoring, supervision, and evaluation of Edward Patterson's medical needs, the delivery of care for him, and the policies and procedures governing his treatment. **WELLPATH's** actions with respect to the care of Edward Patterson exhibited deliberate indifference to Edward's serious medical needs. Furthermore, and in the alternative, **WELLPATH's** care of Edward Patterson fell below the applicable standard of care and was negligent. **WELLPATH** is also liable under the doctrine of respondeat superior for the torts and the constitutional violations of its employees, as described herein.

37. Defendants **MEDICAL STAFF MEMBERS JOHN/JANE DOES 6-10** were

responsible for providing adequate and appropriate medical care for Edward Patterson, including for drug addiction. They were responsible for the documentation and paperwork necessary for continuity of care of Edward Patterson, including evaluation and monitoring of the medical condition, health, and safety of Edward Patterson and providing appropriate and adequate care and assessments for him, with proper documentation of same. Defendants **MEDICAL STAFF MEMBERS JOHN/JANE DOES 6-10** failed in their responsibility to ensure that Edward Patterson was in a safe, appropriate environment, that he was receiving appropriate treatment, and to report relevant facts regarding Edward's behavior and symptoms to appropriate medical providers. These defendants' actions with respect to the care of Edward Patterson exhibited deliberate indifference to Edward's serious medical needs. Furthermore, and in the alternative, these defendants' care of Edward Patterson fell below the applicable standard of care and was negligent.

38.   Defendant deputies **JANE and JOHN DOES #1-5** are each persons who had the responsibility and duty to monitor and intervene to prevent misconduct, including consumption of illegal drugs, on Edward Patterson's tier on December 1, 2018 and November 26, 2018. Each of these defendants failed in their duty to him, exhibiting deliberate indifference and/or negligence, and thereby creating an unconstitutional risk of harm to inmates and their safety, including Edward Patterson.

39.  Defendants GUSMAN and WELLPATH were specifically charged with the responsibility of ensuring that the policies, procedures and practices regarding security staffing and healthcare and therefore knew or must have known that the above described inadequacies posed a grave risk of harm to OJC inmates and their safety, including Edward Patterson.  Despite this, Defendants took no action to remedy these deficiencies and therefore

directly sanctioned and subscribed the practices posing grave risks to inmates at OJC, including Edward Patterson.

40.   The risk of harm or death imposed upon Edward Patterson was obvious, and must have been or should have been known to Defendants, yet all Defendants named herein failed to take corrective measures to remedy the risks of harm or death.  The Defendants' failures demonstrate a deliberate indifference to the safety and well-being of inmates at OJC, including Edward Patterson, and constitute reckless and negligent behavior.

41.   As a result of the above described actions, Defendants are jointly and in solido liable for the death of Edward Patterson.

## FIRST CAUSE OF ACTION

42.   Plaintiffs reaver and re-allege each and every allegation of this Complaint.

43.   The defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that acted to deprive Edward Patterson of his constitutional rights and did deprive him of said rights, specifically, the right to a reasonably safe and secure place of detention, reasonable and adequate medical care, the right to be free from cruel and unusual punishment, and the right to due process and equal protection of the laws as protected by the Fourteenth Amendment and Article IV (Privileges and Immunities Clause) of the United States Constitution and 42 U.S.C. § 1983.

44.   At all times pertinent herein, the defendants, acting individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the constitutional and civil rights and life and serious medical needs of the deceased, Edward Patterson.

45.   The defendants' actions were reckless, willful, wanton, and/or malicious.

46.   Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of Edward Patterson, deceased, described herein, but failed to do so.

47.   Plaintiffs further alleges that such acts as alleged herein were the proximate cause and cause in fact of the injuries sustained and the death of Edward Patterson and the damages incurred thereby.

## SECOND CAUSE OF ACTION

48.   Plaintiffs reaver and re-allege each and every allegation of this Complaint.

49.   Defendants **GUSMAN, MAYNARD,** and **WELLPATH, LLC**, acting individually and collectively, established, condoned, ratified, and encouraged customs, policies, patterns, and practices that directly and proximately caused the deprivation of the civil and constitutional rights of the deceased, as alleged herein, and the damages and injuries described herein, in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. 1983.  They did so with deliberate indifference to the rights of detainees at OJC facility.

50.   These written and unwritten policies, customs, patterns and practices include but are not limited to:

      a.   Inadequate staffing of and failure to monitor tiers where inmates are housed;

      b.   Inadequate, improper, and unreasonable screening, treatment, monitoring and supervision of the serious medical and psychiatric needs of persons in custody;

      c.   Inadequate and unreasonable sick call, referral, and follow-up procedures relative to the serious psychiatric needs of persons in custody;

      d.   Inadequate and unreasonable on-site medical and psychiatric staffing and

coverage;

e.  Hiring of inadequately trained and inexperienced persons to screen and monitor persons in the custody of OPSO;

f.  Hiring of inadequately trained persons to render medical and psychiatric treatment to persons in custody;

g.  Inadequate training, supervision, and discipline of medical personnel responsible for screening, diagnosis, and treatment of medical conditions at Orleans Justice Center;

h.  Inadequate hiring, training, supervision, and discipline of deputies and supervisors responsible for the observation and monitoring of detainees and the identification and communication of problems and/or serious medical needs of persons in custody to appropriate medical personnel;

i.  A pattern and practice of ignoring detainees' requests and needs for medical and/or psychiatric treatment, including the need for proper medications, and/or of providing unreasonable and patently insufficient treatment for detainees' conditions, and/or failing to properly monitor detainees who are treated, causing serious pain, suffering, injury, and/or death;

j.  Inadequate quality control policies, procedures, and practices; inadequate critical incident review; inadequate mortality reviews; and inadequate identification and correction of serious deficiencies in policy and practices affecting the delivery and quality of medical and psychiatric services.

51.  In addition to the injuries sustained by the plaintiff herein, the deliberate indifference of defendants **GUSMAN, MAYNARD and WELLPATH, LLC**, in their official

capacities as Sheriff of Orleans Parish, the OJC Compliance Director, and the medical provider for Orleans Justice Center respectively, to the serious medical needs of detainees under their custody and control has resulted in numerous other instances of detainees suffering serious and oftentimes fatal injuries and illnesses.

52.   At all times pertinent herein the defendants acted unreasonably and with deliberate indifference and disregard for the constitutional and civil rights to life and safety of the deceased, Edward Patterson.  The actions of the defendants were malicious, willful, wanton and reckless.

53.   Plaintiff further alleges that such acts and omissions as alleged herein were the proximate cause and cause in fact of the death of Edward Patterson, the injuries suffered by the plaintiff, and the damages incurred.

## THIRD CAUSE OF ACTION

54.   Plaintiffs reaver and re-allege each and every allegation of this Complaint.

55.   The supplemental jurisdiction of the Court is invoked for all claims under state law.

56.   At all times described herein, the defendants, individually and collectively, acted negligently, with gross negligence and/or intentionally in denying reasonable and necessary medical care to Edward Patteson, failing to properly monitor him, confining him in unsafe, unreasonable, and dangerous conditions that provided him with access to material with which to harm himself, and in inflicting physical injury and severe emotional, mental and physical pain and suffering upon him, in violation of Louisiana constitutional and statutory law.

57.   The actions and inactions of the defendants caused the wrongful death of Edward Patterson.  At all pertinent times the defendant employees of the OPSO and the defendant

employees of WELLPATH were acting in the course and scope of their employment and the defendant sheriff GUSMAN, in his official capacity, and/or WELLPATH are vicariously liable for the injuries and damages incurred herein as a result of their actions. For defendant WELLPATH, this respondeat superior liability extends also to constitutional torts committed by its employees in the course and scope of their employment.

58.   Defendants, WELLPATH and MEDICAL STAFF JOHN/JANE DOE #6-10 acted in derogation of thier duties as medical professionals and providers and their treatment of Edward Patterson was beneath the standard of care in the community.

59.   All defendants named herein are liable for the wrongs complained of herein by virtue of encouraging, aiding, abetting, counseling, ratifying and condoning the commission of the afore-described acts, by their failure to properly administer, organize, and staff the medical and correctional program and for the failure to properly screen, hire, train, supervise, and discipline persons under their supervision and control whose acts and omissions contributed to the death of Edward Patterson.

60.   The defendants are liable individually and jointly for their actions as alleged herein.

61.   Plaintiffs further allege that the above-described actions and omissions were the proximate cause and cause in fact of the injuries sustained herein.

## DAMAGES

62.   As a result of the actions of the defendants as described above, damages have been incurred as follows:

    a.   The deceased, Edward Patterson, suffered conscious and severe physical, mental, and emotional distress, pain and suffering prior to his death, and lost his life.

b. T.P., the minor child of Edward Patterson, suffered emotional pain and suffering, past, present, and future; loss of support; and has suffered the loss of love, affection, and companionship of her father, Edward Patterson.

c. N.P., the minor child of Edward Patterson, suffered emotional pain and suffering, past, present, and future; loss of support; and has suffered the loss of love, affection, and companionship of her father, Edward Patterson.

d. E.P., the minor child of Edward Patterson, suffered emotional pain and suffering, past, present, and future; loss of support; and has suffered the loss of love, affection, and companionship of her father, Edward Patterson.

## **PRAYER FOR RELIEF**

63.  WHEREFORE, plaintiffs pray that after due proceedings there be judgment rendered herein in plaintiffs' favor and against all defendants individually and jointly, as follows:

a. Compensatory and punitive damages as prayed for herein;

b. Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, and all costs of these proceedings and legal interest;

c. All other relief as appears just and proper to this Honorable Court.

Respectfully submitted,

**SANTANA & BLANCHARD, LLC**

/s/ Wesley J. Blanchard_____
**WESLEY J. BLANCHARD (#35047)**
ERIC J. SANTANA (#34970)
3500 N. Hullen St., Ste. 17K
Metairie, LA 70002
Phone: (504) 323.6000
Direct: (504) 500.1756
Fax: (504) 324.0757
Wes@santanablanchard.com